# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

CHRISTINE ALISEN RADTKE,

       Plaintiff,


v.                                    **MEMORANDUM OF LAW & ORDER**
                                Civil File No. 10-4175 (MJD/JJG)


MISCELLANEOUS DRIVERS & HELPERS
UNION LOCAL #638 HEALTH, WELFARE,
EYE & DENTAL FUND,

       Defendant.

---

Richard D. Snyder, Christopher A. Stafford, and Thomas S. Fraser, Fredrikson & Byron, PA, Counsel for Plaintiff.

David L. Hashmall, Peter M. Rosene, Andrew E. Staab, and Alyssa M. Toft, Felhaber Larson Fenlon & Vogt, PA, Counsel for Defendant.

---

## I.      INTRODUCTION

This matter is before the Court on cross motions for summary judgment: Defendant's Motion for Summary Judgment [Docket No. 68] and Plaintiff's Motion for Entry of Judgment [Docket No. 74].  The Court heard oral argument on December 2, 2011.

## II.     SUMMARY OF THE COURT'S OPINION

The Court enters judgment for Plaintiff Christine Alisen Radtke.  The Fund breached the terms of the Plan when it terminated Plaintiff's enrollment based on its erroneous and unreasonable interpretation of Minnesota law.  The State of Minnesota law recognizes the Radtkes' marriage as a marriage between a man and a woman because Minnesota law recognizes Plaintiff's sex as female.  Ms. Radtke is Mr. Radtke's legal spouse under Minnesota law and an eligible dependent under the Plan.

The Plan was unambiguously written to allow all persons who are legal spouses under Minnesota law to be eligible family dependents.  The Fund's role was to ascertain Minnesota law.  It was not the Fund's role to impose its own definitions of gender and marriage upon its participants.  In this case, the Fund ignored all evidence of the State of Minnesota's view of Plaintiff's sex and marital status.  The Fund's decision was not only wrong, under a de novo review, it was a flagrant violation of its duty under any standard of review.  In sum, the Fund erred when it terminated Plaintiff's participation as an eligible family dependent. The Fund's termination of Ms. Radtke is reversed and she is reinstated as a participant as of April 19, 2010.

III.    BACKGROUND

### A.     Factual Background

### 1.     The Plan Documents

Defendant Miscellaneous Drivers and Helpers Union Local #638 Health, Welfare, Eye and Dental Fund ("the Fund") is a welfare trust fund that provides health care benefits for eligible members and their dependents.  The operation of the Fund is governed by the Restated Agreement and Declaration of Trust ("Trust Agreement").  (Snyder Decl., Ex. 1.)

The Plan Document is the Summary Plan Description, Class 12, Amended and Restated Effective May 1, 2005 (the "Plan").  (Snyder Decl., Ex. 2.)  Although the document states that it is a summary plan description, it provides that it is the only document governing eligibility and benefits for medical coverage.  (Id., "Important Notice" section.)

Wilson-McShane Corporation is the claims administrator for the Fund. (Snyder Decl., Ex. 5, Winkel Dep. 14.)  It adjudicates claims, meaning that it decides whether a claim for medical services is covered and what amount is reimbursable.  (Id. 14-15.)  The claims administrator does not make eligibility determinations.  (Id. 19.)

The Fund Office consists of four paid administrative employees of the

Fund.  (Winkel Dep. 19-20.)  The Fund Office handles all eligibility

determinations.  (Id. 19; Snyder Decl., Ex. 6, Coleman Dep. 6.)  The Plan provides

that, "[i]n carrying out its plan responsibilities, the Fund Office shall have

discretionary authority to construe the terms of the Plan."  (Plan, Introduction

Section ¶ 3.)

### 2. Plaintiff's Background

#### a) Plaintiff's Transition

Plaintiff Christine Alisen Radtke was born in Prairie du Chien, Wisconsin,

in 1965.  At birth, upon inspection of her anatomy, she was declared to be male

and was named Richard William Barker.  (Snyder Decl., Ex. 9.)  While in her

early twenties, she was diagnosed with gender dysphoria, in which a patient's

psychological identification of her gender does not match the anatomical

identification.  (Snyder Decl., Ex. 15, Appeal Letter at 1.)

In 1986, the Hennepin County District Court granted Richard Barker's

request to change names to Christine Alisen Jensen.  (Snyder Decl., Ex. 11.)  In

the mid-1980s, Plaintiff participated in the Transgender Program at the Program

in Human Sexuality through the Department of Family Practice and Community

Health at the University of Minnesota Medical School.  (Snyder Decl., Ex. 12.)  In

1988, Plaintiff received gel breast implants.  (Snyder Decl., Ex. 13.)

In 2003, Plaintiff underwent sex-reassignment surgery in Colorado.

(Snyder Decl., Ex. 15, Appeal Letter at 12.)

In 2005, Plaintiff filed a "Petition for Modification of Birth Record and

Issuance of Replacement Birth Certificate" with the Goodhue County, Minnesota,

District Court.  (Snyder Aff., Ex. 16.)  The verified Petition identified Plaintiff's

legal name change and her male-to-female sex-reassignment surgery as the basis

for the requested modification and reissuance of her birth certificate.  The

Petition requested that the court direct the Wisconsin State Registrar to register a

replacement birth record changing the name on the birth certificate and

designating her sex as female.

Wisconsin Law provides:

> The state registrar may change information on a birth certificate
> registered in this state which was correct at the time the birth
> certificate was filed under a court or administrative order issued . . .
> in another state . . . if:  (a) The order provides for a[] . . . name change
> with sex change . . .

Wis. Stat. § 69.15(1).

The Goodhue County Court heard Plaintiff's Petition on July 1, 2005. (Snyder Decl., Ex. 17, Order Granting Modification of Birth Certificate.)  On that date, the court issued an order directing the Wisconsin State Registrar to register a replacement birth certificate for Plaintiff designating her name as Christine Alisen Jensen and designating her sex as female.  (Id.)  On July 14, 2005, the Wisconsin State Registrar issued a birth certificate to Plaintiff stating her name as Christine Alisen Jensen and identifying her sex as female.  (Snyder Decl., Ex. 18.)

### b)   Plaintiff's Marriage

On July 12, 2005, Calvin Radtke and Plaintiff applied for a marriage license.  A marriage license was granted by Goodhue County, Minnesota, that same day.  (Snyder Decl., Ex 19.)  On August 10, 2005, Calvin Radtke and Plaintiff were married in a civil ceremony by an authorized official and before two witnesses at the Goodhue County Courthouse in Red Wing, Minnesota. Goodhue County recorded the marriage and issued a marriage certificate on August 10, 2005, marked as a "COMPLETE AND CORRECT COPY OF THE LEGAL MARRIAGE RECORD ON FILE AND OF RECORD."  (Snyder Decl., Ex. 20.)  As a result of the marriage, Plaintiff's legal name was changed from Christine Alisen Jensen to Christine Alisen Radtke.

### 3.    Enrollment in the Plan

Calvin Radtke is an employee of United Parcel Service and a participant in the Plan.  (Lehnen Aff. ¶ 2.)  Mr. Radtke informed the Fund Office that he was planning to marry.  On June 22, 2005, the Fund Office sent a letter to Mr. Radtke regarding the process to enroll a spouse in the Plan.  (Snyder Decl., Ex. 7.)  The letter told him to fill out an enrollment card and to provide a copy of a certified marriage certificate.  (Id.)

On August 11, 2005, after the Radtke's marriage ceremony, Mr. Radtke completed an enrollment card for Ms. Radtke and provided the marriage certificate to the Fund Office.  (Snyder Decl., Ex. 22.)  The Fund Office accepted the marriage certificate as evidence that Ms. Radtke was Mr. Radtke's legal spouse and enrolled her in the Plan as an eligible family dependent, effective August, 10, 2005.  (Lehnen Aff. ¶ 3.)

### a)    The Plan's Definition of "Spouse"

The Plan defines "Eligible Family Dependents."  (Plan at 6.)  The May 2005 version of the Plan states that an eligible spouse is a "[l]egal spouse pursuant to Minnesota Statute 517."  (Id. at 6.)  Effective January 1, 2006, the Trustees amended the definition of eligible spouse to state: "Your legal spouse.  The Plan

7

may require that you provide a copy of your marriage certificate before any

benefits are paid for a spouse." (Snyder Decl., Ex. 3 at 1.)

The Fund Office has always interpreted the eligibility language for spouses

to mean only that an individual must possess a government-issued marriage

certificate verifying that he or she is married. (Snyder Decl., Ex. 6, Coleman Dep.

8-9.) When an employee seeks to enroll a spouse as a participant in the Plan, the

Fund Office only requires that the employee fill out an enrollment card and

provide a copy of the marriage certificate. (Snyder Decl., Ex. 7; Snyder Decl., Ex.

25, Interrogatories 2-3.) The Fund Office has never based a determination of a

person's eligibility to enroll as a "legal spouse" on anything other than the

existence of a marriage certificate. (Snyder Decl., Ex. 8, Admission No. 1.)

### b) The Fund's Knowledge of Plaintiff's Transgender Status

In 2008, one of Ms. Radtke's gel breast implants ruptured and needed to be

replaced. (Snyder Decl., Ex. 13.) On the "pre-authorization" request, Ms.

Radtke's physician identified her as a transgender individual. (Id.) The gel

implant replacement request was denied under a Plan exclusion for "charges for

sex transformation surgery . . . and any related expenses." (Id.)

8

All correspondence relating to the pre-authorization request was sent to the claims administrator, Wilson-McShane.  (Id. at 1.)  At that time, an individual in the Fund Office who handles eligibility issues heard a comment about Ms. Radtke's "transgendered status."  (Snyder Decl., Ex. 6, Coleman Dep. 15.) Neither the claims administrator nor the Fund Office took steps to question Ms. Radtke's eligibility to participate in the Fund as a "legal spouse."  (Id. 17-18.) The Fund continued to pay Ms. Radtke's other medical claims.  (Id.)

In March or April 2010, a nurse spoke to Toni Coleman, a benefits assistant for the Fund.  (Coleman Dep. 5, 12-13.)  During their conversation, the nurse stated "that they had been dealing with [Mr. Radtke's] girlfriend." (Coleman Dep. 13.)  Coleman became concerned that Ms. Radtke was Mr. Radtke's girlfriend, rather than his wife.  (Id. 14.)  She testified, "At that time I also recalled a comment that had been made in 2008 about [Plaintiff's] transgendered status which led me to think that maybe they weren't really married."  (Id. 15.) Coleman reviewed the Radtkes' file and found the marriage certificate.  (Id. 18.) She decided that she did not know whether the marriage was valid, so she contacted the Fund's counsel, Peter Rosene, and asked him to conduct an investigation.  (Id. 18-19.)

### 4.      The Fund's Termination of Ms. Radtke

At a Board of Trustees meeting in April 2010, the issue of whether the Radtkes' marriage was legal arose.  The Trustees asked Rosene to determine whether the Radtkes' marriage was legal.  (Snyder Decl., Ex. 4, Hawley Dep. 29.)

On or before April 14, 2010, Rosene instructed the Fund Office to terminate Ms. Radtke's benefits, which they did.  (Snyder Decl., Ex. 6, Coleman Dep. 20, 24-25.)  A termination letter, dated April 19, 2010, was sent to Mr. Radtke on Wilson McShane letterhead, stating: "The Fund has learned, for the first time, that Christine underwent a male to female sex reassignment surgery prior to your marriage."  (Snyder Decl., Ex. 23.)  It explains:

> The Fund currently uses the Minnesota statutory definition of marriage as one of the tests for eligibility under the Fund. Minnesota Statute section 517.01 states that "Lawful marriage may be contracted only between persons of the opposite sex".  Minnesota Statute section 517.03 Subd. 1(4) states that "a marriage between persons of the same sex" is prohibited.

(Id.)  It concludes:

> In reviewing the terms of the Fund, it is the judgment of the Claims Administrator that despite the amendment of Christine's birth certificate and your subsequent marriage, the basis for your marriage is not one that is currently recognized under any express provisions of Minnesota Law.  Accordingly, Christine is not an eligible dependent under the Fund.

(Id.)

### 5.    Ms. Radtke's Appeal

By letter dated May 6, 2010, Ms. Radtke appealed the termination, contending that, "[n]o later than July 14, 2005, [she] was judicially and administratively recognized for all purposes as female."  (Snyder Decl., Ex. 15, Appeal Letter at 2.)  With her appeal, she included various exhibits, including the certification from her surgeon that she underwent sex-reassignment surgery in 2003 (id. at 12), a copy of the Minnesota state court order ordering the Wisconsin State Registrar to issue an amended birth certificate designating her as female (id. at 13); a copy of her amended Wisconsin birth certificate (id. at 14); her marriage certificate (id. at 16); the order granting her name change (id. at 11); and documents demonstrating that state and federal agencies, such as the Internal Revenue Service, the Minnesota Department of Public Safety, and the Social Security Administration, recognize Ms. Radtke as female and Mr. Radtke's legal spouse (id. at 17-22).

The Trustees considered Ms. Radtke's appeal at their May 26, 2010, meeting and voted to uphold the determination that Ms. Radtke was ineligible. (Lehnen Aff., Ex. G.)

The Fund's counsel then prepared and sent the appeal denial letter. (Snyder Decl., Ex. 24.)  The denial letter does not dispute any of the facts shown

11

by Ms. Radtke's appeal and exhibits, but rests solely on the legal conclusion that,

given those facts, the marriage is invalid:

> As you know, the terms of the plan are specific regarding the test for an eligible spouse, those terms being the adoption of Minn. Stat. § 517. The trustees specifically reviewed what they thought was intended with the adoption of this definition, and do not believe that Christine Radtke is an eligible spouse within the meaning of the plan.

> I have reviewed with the Board the case you cited from New Jersey; However, I have also informed them that authority exists in New York, Kansas, Ohio, Texas, and Florida finding such marriages void. Minnesota has not ruled on this issue. The Board finds that it is more probable that the terms "man" and "woman" as used in § 517.01 mean that sex which is observed and recorded at the time of birth, rather than based on subsequent events.

> * * *

> The Board is taking this action based upon their understanding of the eligibility provisions of the plan, particularly the adopted statutory definition of spouse.

(Id.)

## B.    Procedural History

On October 7, 2010, Ms. Radtke filed a Complaint against the Fund in this

Court. [Docket No. 1] The Complaint alleges: Count One: Wrongful Denial of

ERISA Benefits, 29 U.S.C. § 1132.

The Fund filed a Counterclaim seeking to have Christine and Calvin

Radtke pay restitution to the Fund in the amount of $80,410.79.   [Docket No. 3]

On January 4, 2011, based on the parties' stipulation, the Court ordered joinder of

Calvin Radtke as Counterclaim Defendant.  [Docket No. 19]

On March 28, 2011, the Court dismissed the Fund's Counterclaim and

dismissed Calvin Radtke as a party to the case.  [Docket No. 31]

Effective July 13, 2011, the Fund amended the Plan to provide:

> [T]he Plan defines a spouse as a male or female member of a legally
> recognized marriage between a man and a woman.  . . .  For
> purposes of deciding whether a marriage is between a man and a
> woman, in all cases, the Board will only recognize the anatomical
> sex of the individual at the time of birth.

(Lehnen Aff., Ex. D, MDHUL 79.)

On August 18, 2011, the Fund filed a Supplemental Answer, in which it

gave notice of the July 13, 2011, amendment to the Plan.  [Docket No. 66]

Each party now moves for summary judgment.

## IV.   DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most

favorable to the non-moving party, there is no genuine dispute as to any material

fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking

summary judgment bears the burden of showing that there is no disputed issue

of material fact.  Celotex, 477 U.S. at 323.  "A dispute is genuine if the evidence is

such that it could cause a reasonable jury to return a verdict for either party; a

fact is material if its resolution affects the outcome of the case."  Amini v. City of

Minneapolis, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248, 252 (1986)).

**B.      Standard of Review under ERISA**

**1.      General Standard of Review**

Under ERISA, a plan beneficiary has the right to judicial review of a

benefits determination.  See 29 U.S.C. § 1132(a)(1)(B).  "[A] denial of benefits

challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard

unless the benefit plan gives the administrator or fiduciary discretionary

authority to determine eligibility for benefits or to construe the terms of the

plan."  Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).  Under a de

novo review, no deference is given to the administrator's decision, and the Court

must "interpret the terms of the plan by giving the language its common and

ordinary meaning as a reasonable person in the position of the plan participant, not the actual participant, would have understood the words to mean." Kitterman v. Coventry Health Care of Iowa, Inc., 632 F.3d 445, 448 (8th Cir. 2011) (citation omitted); Davidson v. Prudential Ins. Co. of Am., 953 F.2d 1093, 1095 (8th Cir. 1992).

"When an ERISA plan grants the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan, courts review the administrator's benefit decisions for an abuse of that discretion." Khoury v. Group Health Plan, Inc., 615 F.3d 946, 952 (8th Cir. 2010) (citation omitted).

### 2.     Interpretation of Law

In this case, the Court applies a de novo standard of review because the Fund's denial is based upon its interpretation of Minnesota law, not on its interpretation of the Plan terms.  The Court does not reach the question of whether a de novo standard should apply on the alternative ground that significant procedural irregularities were involved in the Fund's determination of Ms. Radtke's eligibility.

When "a plan's decision to deny benefits is based on its construction of existing law, the plan's interpretation of a controlling principle of law is reviewed de novo." Meyer v. Duluth Building Trades Welfare Fund, 299 F.3d 686, 689 (8th Cir. 2002).  In Meyer, the plan denied benefits under an exclusion in the plan for injury "which would be covered under Workers' Compensation, or similar law." Id. at 688.  The fund administrator explained to the claimant that, under the fund administrator's interpretation of the Minnesota Workers' Compensation Act, the claimant could have been covered by the workers' compensation carrier if he had so elected.  Id.  The Eighth Circuit undertook a de novo interpretation of the Minnesota Workers' Compensation Act and determined that the plaintiff was ineligible for workers' compensation benefits, and, therefore, the fund administrator's denial had to be reversed.  Id. at 692.  See also Hogan v. Raytheon, Co., 302 F.3d 854, 856-57 (8th Cir. 2002) (applying de novo standard to review plan administrator's review of a divorce decree, although plan granted discretionary authority to the plan administrator to interpret the plan's terms, because the inquiry did not require an interpretation of the plan's terms but, instead, the interpretation of the terms of an outside document - the decree).

Here, the Fund's decision is reviewable de novo because that decision was based solely on an interpretation of Minnesota's marriage laws.  (See Snyder Decl., Ex. 23, April 19, 2010, Termination Letter ("The Fund currently uses the Minnesota statutory definition of marriage as one of the tests for eligibility under the Fund. . . . .  [T]he basis of your marriage is not one that is currently recognized under any express provisions of Minnesota Law.  Accordingly, Christine is not an eligible dependent under the Fund."); Snyder Decl., Ex. 24, June 1, 2010, Appeal Denial Letter ("As you know, the terms of the plan are specific regarding the test for an eligible spouse, those terms being the adoption of Minn. Stat. § 517.  . . .  The Board finds that it is more probable that the terms 'man' and 'woman' as used in § 517.01 mean that sex which is observed and recorded at the time of birth, rather than based on subsequent events.").  By its own representations, the Fund did not determine that Plaintiff was ineligible based on any independent language in the Plan, but rather, because it interpreted Minnesota state law as invalidating the Radtkes' marriage.  Moreover, the Plan language itself states that an eligible dependent spouse must be a "[l]egal spouse pursuant to Minnesota Statute 517," incorporating Minnesota law by reference. (The 2006 amendment defines eligible spouse as "[y]our legal spouse.")

This case is like <u>Meyer</u> and <u>Hogan</u>, in which the Eighth Circuit applied a de novo standard of review to the administrators' review of Minnesota law and a Tennessee divorce decree, respectively.  The Fund explicitly based its termination of Ms. Radtke entirely on its conclusion that Minnesota law holds that the Radtkes' marriage is void.  In order to review the Fund's decision, the Court must analyze whether, in fact, Minnesota law holds that the Radtkes' marriage is void.

**C.    De Novo Review: Whether the Radtkes' Marriage Is a Legal Marriage**

**1.    Introduction**

Defendant argues that, under Minnesota law, "marriage between persons of the same sex" is "void."  Minn. Stat. §§ 517.03, subd. 1(a)(4); 518.01.  <u>See also</u> <u>Baker v. Nelson</u>, 191 N.W.2d 185, 186 (Minn. 1971) (holding that Minnesota law prohibits same-sex marriage).  The Fund concludes that, for Ms. Radtke to be a "legal spouse" under Minnesota law, the Radtkes' marriage cannot be between two individuals of the same sex.  The parties agree that Calvin Radtke is considered to be male under Minnesota marriage law.  As framed by the Fund, the operative question is whether Minnesota law considers Christine Radtke to

be male or female for the purpose of marriage.  Unquestionably, if Minnesota

considers Christine Radtke to be female, then she is Calvin Radtke's legal spouse.

### 2.    Irrelevancy of Defendant's Arguments Regarding Same-Sex Marriage

Due to Defendant's persistent attempts to obscure the issue before the

Court, the Court must begin its analysis by clarifying that this case is not about

same-sex marriage.  The recognition of same-sex marriage is not at issue here,

and the Court makes no determination regarding the application of the Plan to

same-sex marriages.

The Court soundly rejects Defendant's assertion that recognizing the

Radtkes' marriage would violate the Minnesota Supreme Court's opinion in

Baker v. Nelson, prohibiting same-sex marriage.  191 N.W.2d 185 (Minn. 1971).

Baker held that same-sex marriages are void in Minnesota.  Plaintiff does not

argue that her marriage is a valid same-sex marriage.  She argues that it is a valid

opposite-sex marriage.  The issue of same-sex marriage is not before this Court.

The Fund's reliance on the Federal Defense of Marriage Act ("DOMA") is

similarly unavailing.  DOMA provides:

In determining the meaning of any Act of Congress, or of any ruling,
regulation, or interpretation of the various administrative bureaus
and agencies of the United States, the word "marriage" means only

a legal union between one man and one woman as husband and
wife, and the word "spouse" refers only to a person of the opposite
sex who is a husband or a wife.

1 U.S.C. § 7.

First, this case is not about same-sex marriage. The question is whether
Plaintiff changed her sex under Minnesota law so that her marriage is recognized
as an opposite-sex marriage under Minnesota law. Second, this case is outside
DOMA's purview, because it does not involve the meaning of any federal law or
ruling, regulation or interpretation of a federal administrative bureau or agency.
The question is purely one of <u>Minnesota</u> law.

The Court now turns its attention to the relevant question of whether
Minnesota recognizes Ms. Radtke as female the purposes of its marriage statute.

### 3.     Compliance with Procedural Requirements

Minnesota law provides the following requirements for marriage:

Marriage, so far as its validity in law is concerned, is a civil contract
between a man and a woman, to which the consent of the parties,
capable in law of contracting, is essential. Lawful marriage may be
contracted only between persons of the opposite sex and only when
a license has been obtained as provided by law and when the
marriage is contracted in the presence of two witnesses and
solemnized by one authorized, or whom one or both of the parties in
good faith believe to be authorized, so to do. Marriages subsequent
to April 26, 1941, not so contracted shall be null and void.

Minn. Stat. § 517.01.  Minnesota statute also sets forth "prohibited marriages,"

which include "a marriage between persons of the same sex."  Minn. Stat. §

517.03, subd. 1(a)(4).  "The legal, as well as ordinary, meaning of 'spouse' is one's

wife or husband."  Hedlund v. Monumental Gen. Ins. Co., 404 N.W.2d 371, 373-

74 (Minn. Ct. App. 1987) (quoting In re Trust of Atwood, 114 N.W.2d 284, 288

(Minn. 1962)).  Only marriages accomplished through the formal ceremonial

process described in Chapter 517 are "legal" marriages in Minnesota, because

Minnesota does not recognize common law marriage.  Abbott v. Abbott, 282

N.W.2d 561, 566 (Minn. 1979).

Here, Plaintiff has complied with all of the Minnesota procedural

requirements for a valid marriage.  Plaintiff obtained a marriage license, was

married in a formal ceremony before two witnesses by a person authorized to

solemnize marriage ceremonies, received a government-issued marriage

certificate, and the marriage was recorded in Goodhue County's "Legal Marriage

Record."  However, there exists Eighth Circuit precedent holding that a person's

compliance with Minnesota marriage procedural requirements, such as obtaining

a marriage certificate, is insufficient when the marriage is void from the outset.

See McConnell v. Nooner, 547 F.2d 54, 55 (8th Cir. 1976) (holding that, although

same-sex couple had obtained a marriage license from the county clerk and were

married by a minister before the Minnesota Supreme Court's decision in <u>Baker</u>,

the marriage was void).  Moreover, Minnesota law provides that a marriage

certificate is prima facie evidence of a valid marriage, but not irrefutable

evidence.  Minn. Stat. § 600.20.  Therefore, the Court will "look behind" the

marriage certificate to analyze whether Minnesota recognizes the Radtkes'

marriage.

### 4. Whether Sex Is Immutably Determined at Birth under Federal Law

The Court rejects the Fund's reliance on decades-old Title VII cases for the

proposition that "sex" is narrowly defined as an immutable biological

determination at birth.  These cases are not relevant to the case at hand because

they are analyzing the meaning of "sex" in Title VII, not under Minnesota law,

and the opinions specifically base their conclusion on a close analysis of Title VII

and its particular legislative history.  <u>See</u> <u>Ulane v. E. Airlines, Inc.</u>, 742 F.2d 1081,

1087 (7th Cir. 1984); <u>Sommers v. Budget Mktg., Inc.</u>, 667 F.2d 748, 750 (8th Cir.

1982).   Therefore, these cases are unhelpful to the analysis of Minnesota law

before the Court.  In any case, the "narrow view" of the term "sex" in Title VII in

<u>Ulane</u> and <u>Sommers</u> "has been eviscerated by <u>Price Waterhouse</u>."  <u>Smith v. City</u>

of Salem, 378 F.3d 566, 573 (6th Cir. 2004) (citing Price Waterhouse v. Hopkins,

490 U.S. 228 (1989)).

An individual's sex includes many components, including chromosomal,

anatomical, hormonal, and reproductive elements, some of which could be

ambiguous or in conflict within an individual.  See In re Lovo-Lara, 23 I. & N.

Dec. 746, 752 (BIA 2005).  The assigned sex of an individual at birth is based only

on observation of anatomy at birth, which itself may change when the individual

reaches puberty.  Id. at 753.  Here, Ms. Radtke is anatomically and hormonally

female.  It would be wholly inappropriate for this Court to invent a narrow

federal definition of "sex" based on the sex assigned at birth and impose that

construction on a Minnesota statute.  Rather, in attempting to ascertain whether

the State of Minnesota views Ms. Radtke as female for the purposes of its

marriage statute, the Court concludes that it is logical to look to "the designation

appearing on the current birth certificate issued to that person by the State in

which he or she was born," id., and to the official government documents issued

by the State of Minnesota, including court orders and marriage certificates and

licenses.

### 5.   Whether the Capacity Requirements for Minnesota Marriage Are Determined at the Time of Marriage

The Fund makes the erroneous legal conclusion that Minnesota's prohibition of same-sex marriages is based on the sex of the parties at the time of their birth, not at the time of their marriage.  The Fund's argument has been rejected by the Social Security Administration (Snyder Decl., Ex. 15, Appeal Letter at 24-25) and by the Board of Immigration Appeals (id. at 26-33).

Minnesota's requirements for the capacity to enter into a marriage contract, by their very nature, apply at the time the marriage is entered into.  For example, both parties must have "attained the full age of 18 years."  Minn. Stat. § 517.02.  Both parties must not be married to anyone else.  Minn. Stat. § 517.03, subd. 1(a)(1).  To apply these requirements as of some time other than the time of the marriage would be absurd – divorced individuals would be prohibited from marrying, and adults could not marry because they once were children.   There is nothing in Minnesota law indicating that the opposite-sex requirement of § 517.01 should be treated differently from the other capacity requirements.  Therefore, the opposite-sex requirement must be determined as of the time of the marriage, rather than as of the time of the participants' births.

### 6.    Plaintiff's Wisconsin Birth Certificate

The State of Wisconsin issued Plaintiff's original and amended birth

certificates.  Wisconsin law explicitly provides for amendment of the sex listed

on a birth certificate "under a court or administrative order issued . . . in another

state . . . if:  (a) The order provides for a[] . . . name change with sex change."

Wis. Stat. § 69.15(1).  Under Wisconsin law, the amendment of Plaintiff's birth

certificate was valid.  There is no indication that Minnesota would not provide

full recognition of Wisconsin's amended birth certificate.

### 7.    Minnesota Law Regarding Changing a Persons' Sex

There is no law in Minnesota that prohibits recognition by the state of a

person's changed sex.  Minnesota is among 43 jurisdictions, including Wisconsin,

that permit individuals who have undergone sex reassignment surgery to change

their birth records to recognize the change of sex.  (Snyder Decl. ¶¶ 3-4.)

Minnesota Statute § 144.218, subd. 4, allows birth records to be amended.

Minnesota, through the Office of the State Registrar, Minnesota Department of

Health, has a long-established policy of allowing transgender individuals to

change the sex designated on their birth records.  (See Snyder Decl., Ex. 26, May

17, 2011, Email from Minnesota State Registrar.)  The 1997 Social Security

Administration decision included in Plaintiff's appeal materials, which

recognizes a Minnesota marriage between a female transgender individual and a

male individual, references the Minnesota Department of Health's policy

permitting amendments to birth records upon receipt of a certified letter from a

physician that a person's sex was surgically changed.  (See Snyder Decl., Ex. 15,

Appeal Letter at 25.)  Currently, the State Registrar provides two ways for

transgender individuals to amend gender designations.  First, the Registrar will

change the sex designated on a birth certificate upon receipt of "a letter from a

physician stating that an individual has completed gender reassignment surgery

or hormone therapy."  (May 17, 2011, Email from Minnesota State Registrar.)

Second, the State Registrar will amend the sex on an individual's birth record

upon order of a court directing it to do so.  (Id.)  In this case, the Goodhue

County Court issued an order to the Wisconsin Department of Health and

Family Services to reissue Plaintiff's birth certificate designating her as female.

This order was sufficient under Wisconsin law for the Wisconsin Department of

Health and Family Services to issue a replacement birth certificate to Plaintiff

designating her sex as female, and it would have been sufficient for the

Minnesota Department of Health to issue a replacement birth certificate for

Plaintiff designating her sex as female, had she been born in Minnesota.

The Goodhue County Court had full information regarding the basis for

the request to amend Plaintiff's birth certificate.  Plaintiff's verified Petition

explained that her male-to-female sex reassignment surgery and legal name

change were the bases for the requested modification and reissuance of her birth

certificate.  Armed with full information regarding why Plaintiff sought to

modify her birth certificate, the Goodhue County Court made the legal decision

that Minnesota law permitted it to order the amendment of Plaintiff's birth

certificate.  That order was never appealed or challenged.  The Fund now

attempts to mount a collateral attack on a final state law decision by a state court.

The only logical reason to allow the sex identified on a person's original

birth certificate to be amended is to permit that person to actually use the

amended certificate to establish his or her legal sex for other purposes, such as

obtaining a driver's license, passport, or marriage license.  The Minnesota

legislature surely knew that the amended certificates will be used for such

purposes.  And, in fact, the Social Security Administration, the Minnesota

Department of Revenue, the Minnesota Department of Public Safety, and the IRS

all recognize Plaintiff as female and/or as Mr. Radtke's legal spouse.  (Snyder Decl., Ex. 15, Appeal Letter at 17-22.)  There is no basis to conclude that Minnesota recognizes Plaintiff as female for some purposes – birth records and driver's licenses, but not for others – marriage certificates.

Here, Goodhue County issued a marriage certificate when there existed a valid Wisconsin birth certificate declaring that Plaintiff was female and an unchallenged Goodhue County District Court Order declaring that Plaintiff was female.  For Goodhue County to have denied the Radtkes' marriage certificate, the county would have had to disregard both Wisconsin and Minnesota law. The Court concludes that all indications of the State of Minnesota's intent indicate that the State recognizes the Radtkes' marriage as a marriage between two opposite-sex individuals.  See In re Lovo-Lara, 23 I. & N. Dec. 746, 748 (BIA 2005) (concluding that North Carolina marriage between a male individual and female transgender individual was valid under North Carolina law because after the petitioner's sex-reassignment surgery, North Carolina issued her a new birth certificate, listing her sex as female, and registered her marriage, listing her as the bride).

8.    **Evidence of Legislative Intent Regarding Marriage by Transgender Individuals**

As the Court has discussed, every indication is that the State of Minnesota permits a person to legally change his or her sex and then recognizes that new sex for all other purposes under Minnesota law.  There is no express provision of Minnesota law that states that a person's sex for marriage purposes must be the sex as recorded at the time of birth.  There is no express provision prohibiting a person who has changed his or her sex through reassignment surgery from marrying someone of the opposite sex at the time of marriage.  The only prohibition related to sex is the prohibition against marriages between persons who are of the same sex at the time of their marriage.  See Minn. Stat. § 517.03, subd. 1(a)(4).

Nor is there any evidence of legislative intent found in legislative history.  Minnesota has taken no steps to prohibit the recognition in Minnesota of marriages involving persons who have changed their sex.  For at least 35 years, some states have permitted transgender individuals to marry persons of the opposite sex.  See M.T. v. J.T., 355 A.2d 204 (N.J. Super. Ct. App. Div. 1976).  Such marriages have been permitted, even in states that banned same-sex marriage, because, through medical treatment, the sex of the person has been changed:

In this case the transsexual's gender and genitalia are no longer discordant; they have been harmonized through medical treatment.  Plaintiff has become physically and psychologically unified and fully capable of sexual activity consistent with her reconciled sexual attributes of gender and anatomy.  Consequently, plaintiff should be considered a member of the female sex for marital purposes.  It follows that such an individual would have the capacity to enter into a valid marriage relationship with a person of the opposite sex and did do so here.  In so ruling we do no more than give legal effect to a Fait accompli, based upon medical judgment and action which are irreversible.  Such recognition will promote the individual's quest for inner peace and personal happiness, while in no way disserving any societal interest, principle of public order or precept of morality.

Id. at 211.  See also Vecchione v. Vecchione, CA Civ. No. 96D003769 (Cal. Super. Ct., Orange County, filed Nov. 26, 1997).

Although the Minnesota legislature was on notice that such marriages were validly occurring in other states, it took no steps to prevent their recognition in Minnesota.  In contrast, the Minnesota legislature enacted a law to prevent the recognition of same-sex marriages that might validly take place in other states shortly after Hawaiian court proceedings indicating that same-sex marriage would become legal there.  See Minn. Stat. § 517.03, subd. 1(b).  If a transgender individual legally marries someone of the opposite sex in a state that expressly allows such marriages, such as New Jersey, and then moves to

Minnesota, the couple remains legally married in Minnesota.  The Minnesota legislature took no steps to prohibit recognition.

The fact that some other states, such as Texas and Kansas, do not recognize marriages such as the Radtkes' is irrelevant to this analysis.  Once even one state – New Jersey – did recognize such marriages, Minnesota was aware of the issue and of the fact that such marriages would be recognized in Minnesota unless the legislature acted.  The Minnesota legislature chose not to act.

### 9.  Non-Minnesota State Law Cases Regarding Marriage by Transgender Individuals

The Court places little weight on Defendant's reliance upon four non-Minnesota cases refusing to recognize marriages between a transgender individual and an individual of the opposite sex.  See In re Estate of Gardiner, 42 P.3d 120, 137 (Kan. 2002); Kantaras v. Kantaras, 884 So.2d 155, 161 (Fla. Ct. App. 2004); Littleton v. Prange, 9 S.W.3d 223, 231 (Tex. Ct. App. 1999); In re Ladrach, 513 N.E.2d 828, 832 (Ohio Prob. Ct. 1987).  First, these are cases from only four jurisdictions.  In jurisdictions that do allow transgender individuals to marry someone of the opposite sex, there is no need for anyone to litigate the issue. Therefore, the lack of cases from other jurisdictions affirmatively holding that a

transgender individual can marry someone of the opposite sex does not signal that most other jurisdictions prohibit such marriages.

Moreover, in <u>Littleton</u>, a state appellate court held that its state trial court's order granting amendment of birth certificate to change sex was erroneous and not binding on the state appellate court. While it may be proper for a state appellate court to make that type of determination of state law, it would not be proper for this federal court to declare a lower Minnesota state court's order and interpretation of Minnesota law void when there is no indication whatsoever that Minnesota's appellate courts would disagree with the lower state court's decision, and, in fact, all evidence points to the contrary.

The Ohio probate court's ruling in <u>Ladrach</u> is inapposite because it was based on that court's reasoning that Ohio does not permit a person to amend the sex designated on his or her birth records, even after sex-reassignment surgery. However, the Ohio court made clear that if Ohio did permit a person to amend the sex on his or her birth certificate following sex-reassignment surgery – as Minnesota does – then the marriage would be valid:

> It seems obvious to the court that if a state permits such a change of sex on the birth certificate of a post-operative transsexual, either by statute or administrative ruling, then a marriage license, if

requested, must issue to such a person provided all other statutory requirements are fulfilled.

In re Ladrach, 513 N.E.2d at 831. Minnesota does have a long-standing policy of permitting change of sex on a birth certificate after a sex-reassignment surgery. Moreover, Plaintiff's birth certificate was amended in Wisconsin, which has a statute explicitly permitting amendment of a birth certificate after sex-reassignment surgery.

### 10. Conclusion

The Fund's interpretation of Minnesota law was unreasonable and wrong. Minnesota law recognizes the Radtkes' marriage as a marriage between a man and a woman because Minnesota law recognizes Plaintiff's sex as female. Every piece of evidence related to this Plaintiff that was presented to the Fund supported the conclusion that the State of Minnesota recognized her marriage – from her name change order, to her Goodhue County Court order requiring amendment of her birth certificate, to her marriage license and marriage certificate. The Plan was unambiguously written to allow all persons who are legal spouses under Minnesota law to be eligible dependents. The Fund's role was to ascertain Minnesota law. It was not the Fund's role to impose its own definitions of gender and marriage upon its participants. In this case, the Fund

ignored all evidence of the State of Minnesota's view of Plaintiff's sex and marital status.  The Fund's decision was not only wrong, under a de novo review, it was a flagrant violation of its duty under any standard of review.  In sum, the Fund erred when it terminated Plaintiff's participation as an eligible family dependent, and that action is reversed.

### D.    2011 Plan Amendment

During the pendency of this proceeding, the Fund amended the Plan to attempt to explicitly refuse to recognize a marriage between two opposite-sex individuals when one of the spouses is a transgender individual.  The July 2011 amendment provided that, "[f]or purposes of deciding whether a marriage is between a man and a woman, in all cases, the Board will only recognize the anatomical sex of the individual at the time of birth."  The Fund claims that this amendment, singling out transgender individuals, prevents the Court from granting Plaintiff the relief that she seeks.

Under ERISA, the scope of review is usually confined to the matters that were actually considered and resolved by the plan administrator, and courts generally consider only the evidence that was before the administrator at the time it made the decision.  See Brown v. Seitz Foods, Inc., Disability Ben. Plan,

140 F.3d 1198, 1200 (8th Cir. 1998).  This is to prevent courts from turning into

"substitute plan administrators."  Id.  Here, the Fund is asking the Court to act as

a substitute plan administrator by deciding the effect of the Plan amendment that

became effective on July 13, 2011, although the Fund has not taken any formal

action to determine whether or not the amendment can and should be applied to

Ms. Radtke.

The Court has concluded that the Fund's decision to terminate Plaintiff's

enrollment in 2010 was improper and reverses the Fund's decision.  The Fund

will now be in a position to address the effect of the 2011 Plan amendment.  It is

not a foregone conclusion that the Fund will apply the 2011 amendment to her.

After all, in the past, the Fund has always applied the language of the 2005 Plan

in effect when Plaintiff originally enrolled, not subsequent amendments.  Nor

would it be proper for the Court to attempt to divine how the Fund might apply

the amendment to Plaintiff's enrollment, should it decide to apply the

amendment at all.  Plaintiff has indicated that she will raise distinct legal

arguments regarding the applicability of the amendment under the Patient

Protection and Affordable Care Act and Title VII.  The Court will not attempt to

predict what action the Fund will take or the legality of that action.

The Court agrees with Plaintiff's assertion that this case does not need to be remanded back to the Trustees because there will be no remaining issues. The Fund determined Ms. Radtke's eligibility under the Plan language that was applicable to her at the time. The Court has reversed that decision and ordered Ms. Radtke reinstated as of the date of the termination. The Fund, itself, will have to decide in the first instance what to do with the July 2011 Plan amendment. The issue of whether the Fund will apply the amended Plan language is not properly before the Court at this time.

Accordingly, based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED**:

1. Defendant's Motion for Summary Judgment [Docket No. 68] is **DENIED**.

2. Plaintiff's Motion for Entry of Judgment [Docket No. 74] is **GRANTED**.

3. Defendant's decision to terminate Plaintiff's participation as an eligible family dependent in the Miscellaneous Drivers and Helpers Union Local #638 Health, Welfare, Eye and Dental Fund ("the Fund") and the Summary Plan Description, Class 12, Amended and Restated Effective May 1, 2005 (the "Plan") is reversed.

4. Plaintiff shall be reinstated as an eligible family dependent in the Plan and Fund retroactive to the date of her termination on or about April 19, 2010.

5.      Defendant, within 60 days of the date of this Order, shall adjudicate all medical and other expenses incurred by Plaintiff during the period of time that her participation in the Plan and Fund had been terminated and promptly pay all covered expenses by paying the providers or reimbursing Plaintiff for all sums previously paid to the providers for such services.

6.      This Court shall retain jurisdiction over this case to assure compliance with this Order.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:   April 2, 2012                    s/ Michael J. Davis
                                          Michael J. Davis
                                          Chief Judge
                                          United States District Court